OPINION OF THE COURT
Timmie Erin Elsner, J.
Sean Wims (petitioner) filed the instant order to show cause seeking restoration to possession of room 10-D (premises) at *272 Abraham Residence III, a community residence/single room occupancy building located at 336 East 96th Street, New York, New York, alleging that he was illegally locked out of his room.
The premises are utilized as housing for people who suffer from mental disabilities as part of an over-all residential rehabilitation program (program) operated by Abraham Residence III and the Jewish Board of Family and Children’s Services, Inc. (respondents). The program is licensed by and governed by regulations promulgated by the New York State Office of Mental Health (OMH).
Petitioner moved into the premises in May 1998 pursuant to an Occupancy Agreement dated May 26, 1998 between himself and respondents (Occupancy Agreement). In the final months of 1999, discharge procedures were undertaken, pursuant to regulations promulgated by OMH, to discharge petitioner from the residence for reasons including but not limited to petitioner’s failure to pay occupancy fees.* By letter dated December 6, 1999, petitioner was notified that he had been administratively discharged from the program and that his discharge date was set for January 10, 2000. He was further informed that the Bellevue Shelter had a bed available for him and that he should report to it. On January 10, 2000, petitioner had not vacated the apartment. When he attempted to return to his room, his access was denied.
Petitioner does not allege any failure on the part of respondents to follow proper administrative procedures in terminating petitioner from the program. The only issue before this court is whether respondents were permitted, pursuant to the Occupancy Agreement and the applicable OMH regulations, to utilize self-help in order to gain possession of the premises upon petitioner’s termination from the program.
OMH REGULATIONS
The regulations promulgated by the OMH detail discharge planning and procedures to be followed by covered residential programs. (See, 14 NYCRR part 595.) The resident is to be “provided with a clearly written residency agreement” (14 NYCRR 595.10 [a] [2]), which details the rights and responsi *273 bilities of the resident. Where a resident is not “discharge-ready,” the resident may nevertheless be discharged where “the resident fails to meet one or more material responsibilities for residency as described in section 595.10(a)(2) and (c)” (14 NYCRR 595.9 [c] [3]). The responsibilities and conditions of residency include, inter alia, payment of residency fees in full in a timely manner (14 NYCRR 595.10 [c] [4]) and compliance with the residency agreement and house rules (14 NYCRR 595.10 [c] [5]). Section 595.10 (d) states that a “residency agreement entered into by the provider of service and the resident may create additional rights and obligations, but may not impose conditions that are inconsistent with the provisions or intent of this Part.”
THE OCCUPANCY AGREEMENT
The Occupancy Agreement, signed by petitioner and an authorized staff member representing respondent, lays out the ground rules by which the residents should abide in order to assure their continued enrollment in the program. The Occupancy Agreement provides the terms and conditions by which the residents shall live, the services the administrator of the programs shall provide and the process by which residency may be terminated. In this regard, the Occupancy Agreement states that “if [the respondents] seek[ ] to terminate residency and the resident refuses to vacate the premises, [the respondents] may elect to commence legal proceedings to evict the resident.” (Occupancy Agreement, at 4.) The Occupancy Agreement also states that “[n]othing contained herein shall be construed to create a relationship of landlord and tenant between the owner/operator of the [residence] and the resident.” (Occupancy Agreement, at 4.)
APPLICABLE LAW
An Occupancy Agreement between two parties is a contract and, as such, should be construed in light of the applicable laws of contract. Words in a contract “are never to be construed as meaningless if they can be made significant by any reasonable construction.” (67 Wall St. Co. v Franklin Natl. Bank, 37 NY2d 245, 248 [1975].) However, “[i]t has long been the rule that ambiguities in a contractual instrument will be resolved contra proferentem, against the party who prepared or presented it” (151 W. Assocs. v Printsiples Fabric Corp., 61 NY2d 732, 734 [1984]; Rapid-American Corp. v Olympic Tower Assocs., 157 AD2d 589, 590 [1st Dept 1990] [holding that ambigú *274 ity in a contract “must be construed against the drawer of the instrument”]).
DISCUSSION
The Occupancy Agreement at issue states “if [the respondents] seek[ ] to terminate residency and the resident refuses to vacate the premises, [the respondents] may elect to commence legal proceedings to evict the resident.” This provision can be interpreted so as to provide three possible alternatives to respondents should a resident refuse to vacate the premises following termination from the programs: use of self-help to regain possession; commencement of legal proceedings seeking the occupant’s eviction of the residence; or allowing the resident to remain in possession of the premises despite termination from the program. The ambiguity in the Occupancy Agreement renders each of these options plausible.
It appears the primary rationale for petitioner’s termination is nonpayment of occupancy fees. Upon information and belief, petitioner remains mentally disabled; thus it is possible that rather than commence legal proceedings against petitioner, the respondents might elect to terminate his enrollment in the program but allow him to remain in possession of the premises so as to avoid rendering him homeless. This interpretation is buttressed by the respondents’ mission as summarized by Rena Gitlitz, Director of the Abraham Residence III, who stated, “[r]ecognizing that homelessness, in situations like Mr. Wims’, flows from a disability, and not merely from lack of a place to live, or the means to pay for one, Abraham provides those services its clients need to avoid becoming homeless again.” (Affidavit in opposition to petitioner’s order to show cause, at 3, H8.)
In this instance, respondents desired recovery of the premises and an ambiguity in the language of the contract exists regarding the manner in which they could accomplish this goal. The Occupancy Agreement is unclear as to whether respondents could resort to self-help or were required to use legal process. Lacking any further information which might aid this court in determining which interpretation was intended by both parties at the time of the execution of the agreement, this court is constrained to resolve the ambiguity against the drafter of the document.
The Occupancy Agreement was drafted on behalf of the respondents and consists of a preprinted form. There is no evidence petitioner negotiated the terms of the Occupancy Agree *275 ment which remain unchanged in any way within the preprinted form. Construing the ambiguity against respondents, this court determines that they were required to commence legal proceedings against petitioner in order to obtain legal possession of the premises.
CONCLUSION
Based upon the foregoing analysis, the respondents are ordered to restore petitioner to possession of the subject room forthwith. This order is without prejudice to either party’s rights to commence and defend against the appropriate legal proceedings seeking possession of the premises.
This court specifically declines to address whether, in the absence of an ambiguity in an Occupancy Agreement, providers would be obligated to commence legal proceedings to recover possession of the premises upon a resident’s termination from a program. The court is aware that any determination of this issue would have far-reaching ramifications on residential rehabilitation programs throughout the State. It is apparent that participants in programs facing loss of their residence based upon discharge will claim that providers must resort to legal process prior to recovering possession of those units. This may result in a deluge of lockout proceedings in courts charged with enforcement of RPAPL article 7. Legislative action should be taken to clarify the occupant’s rights under these circumstances.

 This court does not have the jurisdiction to review the administrative discharge procedures at issue here. However, from the exhibits submitted, there appear to be three rationales for petitioner’s discharge. First, petitioner refused to cooperate with caseworkers. Second, he voiced a desire to live in the community on his own. Finally, approximately $8,000 in occupancy fees were due to respondents.